Jane M. Imholte
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
188 W. Northern Lights Blvd., Suite 700
Anchorage, Alaska 99503
Phone: (907) 646-3400
Fax: (907) 646-3480
Email: jane_imholte@fd.org

*Counsel for Defendant Kaden August Ollila*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| UNITED STATES OF AMERICA, Plaintiff, vs. KADEN AUGUST OLLILA, Defendant. | Case No. 1:24-cr-00003-TMB-MMS **DEFENDANT'S SENTENCING MEMORANDUM** |
|---|---|

Kaden August Ollila, by and through his attorney of record, Jane M. Imholte, respectfully submits this Sentencing Memorandum.

## I. INTRODUCTION

Kaden Ollila is a 21-year-old man with no previous criminal history in need of intervention and treatment. His offenses, while undoubtedly serious, were committed behind a computer screen. There is no evidence of any hands-on offense or attempt at the same. Mr. Ollila readily accepted responsibility for his crimes and also admits that he needs help.

## II. THE GUIDELINES RANGE AND OBJECTIONS TO THE PSR

Mr. Ollila technically agrees with the guideline calculation as contained in the Presentence Report ("PSR" at Dckt. 65). Mr. Ollila has no criminal history, making him a Criminal History Category I. The Total Offense Level is 41. The resulting guideline range would be 324-405 months in prison, followed by a minimum of five years to life of supervised release. This range suggests an astounding sentence for a first-time offender who has never touched a child. In fact, a court might well describe such a sentence as "draconian," "unconscionably harsh," and yielding "unjust and sometimes bizarre results." See, e.g., *United States v. Grober*, 624 F.3d 592, 596 (3rd Cir. 2010); *United States v. Overmyer*, 663 F.3d 862,867 (6th Cir.2011) (Merritt, dissenting); *United States v. Gray*, 649 F. 3d 955, 964 (9th Cir.2011)(Berzon, concurring).

Mr. Ollila maintains only one objection to the PSR, as noted at page 42 of 42. Mr. Ollila disputes that there were 148 victims in this matter. Homeland Security states that there are a total of 31 victims, while the case agent believes that number to be 148. PSR at ¶¶ 42 and 43. Paragraph 43 further notes that some of the victims include members of Mr. Ollila's own family. This cannot be the case due to the nature and definition of the offenses. Mr. Ollila had pleaded guilty to once count of Sexual Exploitation of a Child—Distribution of Child Pornography. There are no family members identified as victims in this offense. He has also pleaded guilty to two counts of Cyberstalking, wherein Mr. Ollila harassed three victims,

none of whom are family members. Any change to the number of victims, however, does not impact Mr. Ollila's guideline range.

## III. THE SENTENCING GUIDELINES RANGE IN THIS CASE DESERVES LESS RESPECT BECAUSE IT WAS NOT THE RESULT OF THE SENTENCING COMMISSION'S PARTICULAR EXPERTISE

On February 17, 2013, the United States Sentencing Commission submitted to Congress a comprehensive report examining federal sentencing policy in Child Pornography cases.[1] Among its findings, the Commission announced that prison sentences for defendants convicted of federal child pornography offenses have almost doubled in the past decade, due in large part to penalty enhancements in U.S.S.G. § 2G2.2 that now apply to most offenders, and thus fail to differentiate among them in terms of their culpability. *See* Chapter 8 at 209.[2] At the same time, rates of within guidelines sentences in child pornography cases have dropped markedly: In the year before *Booker*, the within-guideline rate was almost 80%. After *Kimbrough*, the rate dropped to 41%, and in fiscal year 2011 dropped further still to less than 33%." Melissa Hamilton, SENTENCING POLICY ADJUDICATION AND EMPIRICISM, Ga. St. U.L. Rev. at 7 (forthcoming) (quoting United States

---

[1] The 26-page executive summary can be accessed at: http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/201212_Federal_Child_Pornography_Offenses/Executive_Summary.pdf.

[2] Full text available at: http://www.ussc.gov/Legislative_and_Public_Affairs/Congressional_Testimony_and_Reports/Sex_Offense_Topics/201212_Federal_Child_Pornography_Offenses/index.cfm.

Sentencing Commission, Report on the Continuing Impact of *United States v. Booker* on Federal Sentencing A73 (2012).[3] These sentences indicate that a growing number of courts view the current sentencing scheme as overly severe for certain offenders.

The undisputed guideline in this case is 324 to 405 months, which is both overly severe while also serving to falsely bolter the sentence sought by the government and probation. In this instance, the advisory range is entitled to less deference in part because it was not the product of the Sentencing Commission's particularized institutional expertise.

**A. This Guideline is advisory only.**

In *United States v. Booker*, 543 U.S. 220, (2005), the Supreme Court declared the Federal Sentencing Guidelines advisory to avoid the Sixth Amendment error inherent in the federal sentencing scheme. Each time the Supreme Court has returned to the *Booker* remedial opinion, it has embraced its central holding. *Kimbrough v. United States*, 128 S. Ct. 558, 564 (2007) (*Booker* instructed district courts to read the United States Sentencing Guidelines as "effectively advisory"; *Spears v. United States*, 129 S. Ct. 840, 842 (2009) (per curiam) ("cocaine Guidelines, like all other Guidelines, are advisory only".); *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (per curiam) ("The Guidelines are not

[3] Full text available at: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2232936.

only not mandatory on sentencing courts; they are also not to be presumed reasonable.").

Apart from the fact that, in this instance, the advisory guideline factor is outweighed by the other § 3553(a) factors, the applicable guideline is entitled to less deference because it was not the product of the Sentencing Commission's particularized institutional role. This is a case where a substantial variance from the Guidelines is both appropriate and justified.

### B. How the Sentencing Commission is supposed to establish sentencing guidelines

Title 18 U.S.C. § 3553(a) identifies the factors that must be considered as part of the sentencing process. Congress established the United States Sentencing Commission to formulate sentencing guidelines that reflect the § 3533(a) factors from a national perspective. *Kimbrough v. United States*, 128 S. Ct. at 574, *Rita v. United States*, 127 S. Ct. 2456, 2464 (2007). Ordinarily, the Sentencing Commission brings expertise to the sentencing process that courts lack. That expertise is the capacity to "base its determinations on empirical data and national experience, guided by a professional staff." *Kimbrough v. United States*, 128 S. Ct. at 574 (quoting *United States v. Pruitt*, 502 F.3d 1154, 1172 (10th Cir. 2007) (McConnell, J., concurring); *see also*, *Gall v. United States*, 128 S. Ct. 586, 594 (2007) (noting that 'even though the Guidelines are advisory rather than mandatory, they are … the product of careful study based on extensive empirical

evidence derived from the review of thousands of individual sentencing decisions.").

The Sentencing Commission also typically formulates the sentencing guidelines after developing empirical data grounded in past practices and research into recidivism rates. *See* United States Sentencing Commission, Fifteen Years of Guidelines Study (November 2004) at 14; U.S.S.G. § 1A1, intro. comment, pt. A, & 3; *Kimbrough v. United States,* 128 S. Ct. at 567. Using these statistics, the Sentencing Commission establishes offense levels for each crime and then links that offense level to a particular recommended imprisonment range. *Id.* at14. When developed in this fashion, the resulting advisory Guidelines range was thought to represent a reasonable sentencing range that fairly addressed the § 3553(a) factors from a national perspective. *Kimbrough v. United States*, 128 S. Ct. at 574-75.

However, because of the institutional flaws in the promulgation of U.S.S.G. § 2G2.2, courts are now routinely giving it less deference than to other guidelines that were based on past practices and Sentencing Commission institutional expertise. *See*, e.g., *United States v. Hanson*, 561 F. Supp. 2d 1004,1009 (E.D. Wis. 2008) ("[G]uideline 2G2.2 is not representative of the Commissions typical role or of empirical study … [t]he guideline has been increased despite evidence and recommendations by the Commission to the contrary."); *United States v. Shipley*,

560 F. Supp. 2d 739, 744 (S.D. Iowa 2008) ("These modifications do not appear to be based on any sort of empirical data, and the Court has been unable to locate any particular rationale for them beyond the general revulsion that is associated with child exploitation offenses.").

The Ninth Circuit has expressly acknowledged that the child pornography guideline has numerous flaws and qualifies as a matter of law for a policy-based rejection. *United States v. Gray*, 649 F.3d 955, 963 (9th Cir. 2011). Because the guidelines were based on Congressional agendas rather than the Commissions' own independent study, sentencing courts have the ability to deviate from them on policy grounds. *Id*. at 960.

For example, the Ninth Circuit has affirmed a five-year probationary sentence for a defendant who confronted an advisory guideline range of 41 to 51 months following his conviction for possession child pornography. *United States v. Autrey*, 555 F.3d 964, 867 (9th Cir. 2009). Autrey was a former reserve police officer who was found with 150 images of child pornography on his computer after he attempted to order additional contraband images.

The district court recognized that child pornography was "terrible stuff" and believed the defendant ordered child pornography knowing that it was "wrong and illegal." *Id*. at 868. However, the court found no evidence that Autrey ever had a hands-on offense and did not fit the profile of a pedophile seen in other cases. *Id*.

The court thought it important that he had the continuing support of his family. The court believed that, under the totality of the circumstances, a sentence of imprisonment would be much more disruptive and more damaging to Autrey's rehabilitation. *Id.* at 868.

## IV. The U.S.C. §3553(a) factors.

To vary from the advisory Guideline Range, the Court must adequately explain the chosen sentence but is *not* required to find extraordinary circumstances to justify the variance. *Gall v. United States*, 552 U.S. 38, 47, 51 (2007).

As the Court is aware, it is obligated to impose a reasonable sentence that is "sufficient, but not greater than necessary[.]" *Id.* at 46; § 3553(a). When determining a sentence, the Court must consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > (B) to afford adequate deterrence to criminal conduct;
> > (C) to protect the public from further crimes of the defendant; and
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
> (5) any pertinent policy statement;
> (6) the need to avoid unwarranted sentencing disparities; and
> (7) the need to provide restitution.

### a. The nature and circumstances of the offense.

Clearly, the distribution of child pornography is a very serious offense. It is one of numerous offenses which involves commercial sex acts and the abominable notion of sexual exploitation of minors. Criminalizing such acts as possession of child pornography reemphasizes the importance of destroying any market intending to exploit children. See *United States v. Rugh*, 968 F.2d 750, 756 (8th Cir. 1992). While distribution of pornography is a serious offense, within the class of sex crimes involving exploitation of children, it is considered somewhat less culpable than the heinous offense of production of child pornography, much less those crimes involving actual physical contact or abduction. There is no suggestion that Mr. Ollila was involved in the actual production of child pornography or that he had sexually abused children in the past; nor did he pay for such material, thereby contributing financially to its production.

Mr. Ollila, like many others who have accessed child pornography via their computers, did not have the initial appreciation of the magnitude of the offense he was committing:

> The manner in which computer technology and high-speed internet access have made such material readily accessible in the presumed privacy of the home has removed several substantial impediments to seeking out such material that previously existed. No longer must a person travel to the seedy side of town, walk into a dirty bookstore, make a request for the sordid material to another person from whom one's identity could not be readily concealed, and pay for it. The easy availability of the material at no cost with the click of a mouse…leaves little but one's natural aversion to depiction of the abuse and degradation of children to stand in the way of obtaining it.

…

> A further fact seems to be the lack of appreciation of the harm that simply viewing such material does to children. In some respects, the internet seems analogous to a huge file cabinet containing an almost limitless number of documents and other forms of information. Under this view, accessing child pornography can be rationalized as simply pulling out a drawer and looking at a photo that someone else took in the past. As long as the individual who accesses the pornography is not himself abusing children to produce it, selling it in order to profit from it, or paying for it so as to stimulate demand for it, he can tell himself that he has done no harm to the children depicted.

*United States v. Ontiveros*, 2008 WL 2937539 (E.D. Wis.2008).

As addressed in *Ontiveros*, though the above factors do not excuse the behavior, they do suggest an explanation for why people such as Mr. Ollila, who at 21 has no prior criminal history, commit such offenses. Once they realize that such conduct does substantial harm to children, many offenders are unlikely to repeat their actions.

These same factors are also at play with respect to Counts II and III. Cyberstalking is a similarly "disembodied" offense. As with the victims of child pornography, Mr. Ollila was not face-to-face with the harm that he caused. Not only was he in another state entirely, but a computer screen also helped hide him from reality. Furthermore, there is no evidence that Mr. Ollila sought to act on any of his violent fantasies, nor that there has ever been a contact offense.

**b. Mr. Ollila's history and characteristics support the recommended sentence.**

Mr. Ollila was born with Fetal Alcohol Spectrum Disorder, a fact unknown to him until recently. *See* Exhibit D-1, Psychoeducational Reports, filed under seal. Mr. Ollila's early life was marked by significant trauma, including sexual abuse and the instability that comes with a drug and alcohol-dependent mother. She overdosed twice in his presence before he was four years old.

Mr. Ollila's father and stepfather were awarded sole custody of Mr. Ollila and relocated to Redding, CA, when he was eight years old. A period of relative calm followed. However, he struggled with boundaries and sexual fascinations that confounded his family. Mr. Ollila's father tried multiple attempts to get help for his son. Unfortunately, there is little-to-no treatment available for non-criminal, youthful, potential sex offenders. Some providers simply refused to even consider treating Mr. Ollila.

Mr. Ollila graduated from high school in 2022, after much struggle. He worked at various low-wage jobs at the time of the offenses, which all occurred while he resided in Redding, WA.

The consequences Mr. Ollila faces extend far beyond incarceration. He will be a life-long felon. He will be supervised for decades upon his release. He will be required to register as a sex offender. He is forever and always marked by this conviction.

**c. Deterrence and public safety are satisfied by the fact of this conviction, not the severity of the sentence.**

As research clearly shows, it is not the severity of the sentence that provides a deterrent effect—either general or specific—rather is it the *certainty* that criminal behavior will be detected and punished. *See* Valerie Wright, "Deterrence in Criminal Justice, Evaluating Certainty vs. Severity of Punishment" (The Sentencing Project, November 2010) http://www.antoniocasella.eu/nume/Wright_2010.pdf. (last accessed June 16, 2025). Overall, research shows that potential criminals are not generally aware of penalties for their prospective crimes, do not believe they will be apprehended and convicted, and simply do not consider sentence consequences in the manner one might expect of rational decision makers. Michael Tonry, Purposes and Functions of Sentencing, 34 Crime and Justice: A Review of Research, 28- 29 (2006). "There is generally no significant association between perceptions of punishment levels and actual levels…implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." Gary Kleck, et al, The Missing Link in General Deterrence Theory, 43 Criminology 623 (2005).

For these reasons, a sentence of five years followed by 25 years of supervised release more than satisfies this factor. In general, sex offenders know that they could be sent to prison if caught. General and specific deterrence will be achieved with a sentence of five years followed by 25 years of supervised release.

**d. A sentence of five years in prison followed by a lengthy period of supervised release will provide Mr. Ollila with educational or vocational training, as well as sex offender treatment.**

Mr. Ollila is a very young man in need of treatment for his sexual compulsions. A sentence of the statutory maximum is not necessary for Mr. Ollila to receive treatment. In fact, it is the real-world, highly monitored application of the skills gained in treatment that will be the ultimate test for Mr. Ollila. Regardless of the court's sentence, he will be a relatively young man upon his release. The sooner he learns to adapt and control his behavior outside of incarceration, the better.

**e. The recommended sentence aligns with recent USSG policy regarding youthful offenders.**

The recently enacted "Youthful Individuals Amendment" to U.S.S.G. § 5H1.1 states that a downward departure may be warranted for a youthful offender because:

> [c]ertain risk factors may affect a youthful individual's development into the mid-20's and contribute to involvement in criminal justice systems, including environment, adverse childhood experiences, substance use, lack of educational opportunities, and familial relationships. In addition, youthful offenders generally are more impulsive, risk-seeking, and susceptible to outside influence as their brains continue to develop into young adulthood. Youthful individuals are also more amendable to rehabilitation.

This new language reflects a refreshing and rare update to the Sentencing Guidelines, one that reflects empirical evidence and allows for the humanity of the

accused. Nearly all of that stated reasons for this departure are present here. Mr. Ollila was literally born with a disadvantage, having had his brain altered by alcohol in utero. His mother's mental health and drug use made for a chaotic early life. He struggled in school and to understand boundaries. His parents tried to get him appropriate intervention, but none was available. Most importantly, Mr. Ollila is ready, willing and more than amenable to rehabilitation.

f. **The government and probation's recommended sentence would constitute a disparate sentence when compared to similarly situated defendants.**

Downward variances are the norm for similarly situated defendants in Alaska. From 2015 to 2025, the downward variance rate for category I child pornography offenders ranged from a high of 100% in 2020 and 2022 to a low of 41.7% in 2024. *See* United States Sentencing Commission Interactive Data Analyzer https://ida.ussc.gov/analytics/saw.dll?Dashboard (last accessed July 23, 2024). Mr. Ollila will not be an outlier should he receive his recommended variance of five years in prison.

Other, much more egregious offenders have received lesser sentences than the one sought here by the government. Arthur Martin was sentenced to a mandatory minimum sentence of 180 months for receipt of Child Pornography. *See United States v. Martin*, 1:18-cr-00010-TMB. His guideline range was 292-365 months, based on an offense level of 40 and a criminal history of I. *Id.* at Dckt. 88.

Mr. Martin's previous conviction for a Sexual Abuse of a Minor in the Second Degree triggered the 15-year mandatory minimum sentence. In that case, an offender with a prior hands-on conviction received a sentence well below the advisory guideline range. Similarly, Jay Leavitt received a sentence of 240 months, or half of his advisory guideline range for Distribution of Child Pornography. *See United States v. Jay Leavitt*, 3:17-cr-00072cr. Mr. Leavitt had a prior conviction for Attempted Sexual Abuse of a Minor, for which he was *on probation* when he committed his offense. Yet with a criminal history score of III and a guideline range of Life, Mr. Leavitt received a significantly below-guidelines sentence.

That the advisory guideline ranges for these types of offenses is overinflated is evident from courts' sentencing decisions. Not only are aggravating factors like a prior contact offense *not* present here, Mr. Ollila presents as more amenable to treatment and youthful than most. This factor supports the recommended sentence of five years of incarceration followed by 25 years of supervised release.

## V. CONCLUSION

In light of his youth, his documented developmental injury, his clear remorse, and the significant collateral consequences he will endure, Mr. Ollila respectfully urges the Court to take all these circumstances into account when fashioning a sentence that is "sufficient, but not greater than necessary" to serve the goals of

sentencing under U.S.C. § 3553(a), to wit: five years of imprisonment with 25 years of supervised release to follow.

DATED at Anchorage, Alaska this 23rd day of July, 2025.

Respectfully submitted,
FEDERAL PUBLIC DEFENDER
DISTRICT OF ALASKA

*/s/ Jane M. Imholte*
Jane M. Imholte
Assistant Federal Defender

Certificate of Service:
I hereby certify that I electronically filed the foregoing and any attachments with the Clerk of Court for the United States District Court for the District of Alaska by using the district's CM/ECF system on July 23, 2025. All participants in this case are registered CM/ECF users and will be served by the district's CM/ECF system.
*/s/ Jane M. Imholte*